**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

DOCKETED

UNITED STATES OF AMERICA      )
          v.                  )
                              )   Criminal No. 04-10336-NMG
JULIO SANTIAGO et al.         )
          Defendants          )

### GOVERNMENT'S SUMMARY OF TESTIMONY TO
### BE OFFERED UNDER FED. R. EVID. 702

The United States of America, by and through Assistant United States Attorney William

F. Bloomer, respectfully submits this summary of expert testimony it expects to elicit at trial

and the qualifications of the testifying witnesses, pursuant to Fed. R. Crim. P. 16(a)(1)(E) and

(b)(1)(C). This filing does not constitute a Bill of Particulars, nor does it encompass a

comprehensive statement of the evidence against the defendants.

1. <u>ATF Agent Richard Vasquez</u>

   A. Summary of Anticipated Testimony

Special Agent Vasquez will testify consistent with his reports which have been provided to

the defendants as part of automatic discovery, including, but not limited to: the 9 mm caliber

AA Arms, model AP-9, serial # 033232, that Santiago is charged with unlawfully possessing,

was made by AA Arms in Mint Hill, North Carolina; the trace (or history of travel) summary

for that firearm; and the handgun is a weapon designed to expel a projectile by the action of an

explosive. Special Agent Vasquez will also testify that the three metal cylindrical devices

(silencers) seized from Santiago's residence have been examined and tested and are firearms

1

280

as defined by 18 U.S.C. § 921(a)(3); that the cylinders are firearms mufflers or silencers as defined by 18 U.S.C. 921(a)(24); that the cylinders are firearms as defined in 26 U.S.C. § 5845(a)(7); and that the cylinders are not marked as required in 26 U.S.C. § 5842. Special Agent Vasquez will also testify to the visual appearance and overall design of the cylinders as silencers; that two of the silencers were test-fired; and that the silencers were capable of diminishing, and did in fact diminish the report of a firearm. The specific report decibel reductions which Special Agent Vasquez will describe during his testimony are described in the ATF Report of Technical Examination, dated November 29, 2004. Special Agent Vasquez will also testify that neither the firearm nor the three silencers were registered to Santiago. A copy of the official National Registration and Transfer Record Certificate for Julio Santiago is enclosed herein. The government will admit this certificate in evidence at trial.

      B.     Qualifications and Bases for Opinions

      Special Agent Vasquez is a Firearms Enforcement Officer with the Bureau of Alcohol, Tobacco and Firearms, who has testified as an expert witness in federal and state court. His qualifications are set forth in the attached CV. The bases for his anticipated testimony and opinions are described in detail in his previously provided reports.

2.  <u>John E. Drugan, Chemist, MA State Police Crime Laboratory</u>

    A.  Summary of Anticipated Testimony

Mr. Drugan will testify consistent with his report dated November 2, 2004, which have been provided to the defendant as part of automatic discovery. Mr. Drugan's report dated November 2, 2004, describes the testing that Mr. Drugan conducted of the silencers and his ultimate findings regarding the presence of gun powder. He will describe and explain the tests

2

conducted on the three metal cylinders (silencers) in an effort to detect gunpowder residue in these items, which were seized from Santiago's apartment. More specifically, he will testify that a swabbing of the inside of cylinders identified as Items 1-6 (8.5" long X 1-3/8" in diameter) and 1-7 (5" long X 1-5/16" diameter) detected components consistent with smokeless gunpowder. A swabbing of Item 1-5 (7-3/4" long X 1-1/2" diameter) detected no trace of gunpowder.

B. Qualifications and Basis for Opinions

A copy of Chemist Drugan's résumé as well as his CV, which discuss Chemist Drugan's qualifications and experience in detail, is attached hereto.

3. <u>Jamie Cepero and/or Terry Hanson, MA State Police Department, and/or Marcos Chavez</u>

It is questionable whether testimony from an experienced narcotics investigator constitutes "expert" testimony under Fed. R. Evid. 702, and is therefore subject to disclosure under Fed. R. Crim. P. 16, but the government sets forth the general parameters of anticipated testimony of Troopers Cepero and/or Hanson, as it relates to general narcotics distribution practices, out of an abundance of caution. Should they testify at trial, Lt. Hanson and TFA Chavez additionally may testify to anything and everything set forth in their reports or affidavits prepared in connection with this case (previously provided to the parties).

A. Summary of Anticipated Testimony

Based on their examination, training, and experience, Troopers Cepero and/or Hanson and/or TFA Chavez ("the witness(es)") will testify to the general criminal narcotics-related matters, including undercover work; controlled buys; the use of confidential informants, search warrants, and electronic surveillance; how heroin is ingested an any paraphernalia associated with its use;

3

the drug-distribution pyramid, including where and how heroin is manufactured, how it is imported into the U.S., and the general manner in which it makes its way to the ultimate consumer; the packaging associated with heroin distribution and the weights and purity in which it is commonly distributed from its point of arrival in the U.S. to the ultimate consumer; common diluents used to "cut" or lessen the purity of heroin; the price-ranges of various quantities of heroin in the Greater Boston area in 2004 and the value of the heroin seized in connection with this case; the absence of the means to consume heroin in this case and its significance; the use of hidden compartments (or "hides") inside motor vehicles to store drugs, money or other paraphernalia in furtherance of drug distribution; the use of firearms as "tools of the drug trade" and as a means of protecting their drug business; the use of "stash pads" or apartments belonging to associates in the drug trade to store and distribute heroin from; counter surveillance measures to detect law enforcement; the use of various implements in heroin distribution (many of which were seized in connection with this case), including, but not limited to scales, heat sealers, presses, spoons, surgical masks and gloves, money, money counters, plastic baggies with or without logos, false forms of identifications, pagers and drug records or "cuff" sheets. The witness(es) may also discuss the use of portable cellular telephones and pagers in drug distribution; that drug dealers frequently use telephones subscribed to by other nominees or fictitious individuals; and that drug dealers commonly "drop" or change telephones in an effort to thwart law enforcement. The witness(es) may also discuss the common use of coded language by drug distributors and the use of codes entered into paging devices in furtherance of narcotics distribution, and that various code words were used in the present case to describe heroin, drug distribution, and money, and codes were entered into Santiago's pager . The witness(es) will

4

opine that the heroin seized in connection with this case, along with the other drug-related paraphernalia, in particular the heroin seized from the residences of Santiago, Rivera, Rodriguez, and the heroin seized from the person of Agosto and Rodriguez, is consistent with the distribution of heroin rather than the possession for personal consumption.

B.  Qualifications and Bases for Opinions

Trooper Cepero's qualifications to testify are as follows:

Trooper Cepero is a Trooper First for the past 21 years. Since January of 2000, he has been assigned to the United States Drug Enforcement Administration ("DEA") Task Force 2 in the City of Boston as a Federal Task Force Agent (TFA) with his primary duties being the investigation of organized narcotics traffickers. Since his assignment in this unit, he has operated in an undercover capacity on several different investigations involving the distribution of heroin and cocaine in the Greater Boston area. He has been an affiant on several federal Title 3-wiretap investigations involving the organized domestic and international importation and distribution of kilogram amounts of cocaine and heroin. These investigations resulted in the arrest and the dismantling of various distribution, transportation, and supply groups operating in the states of Massachusetts, New York, and Florida, and in Costa Rica, Colombia, and the Dominican Republic, and the seizure of over 100 kilograms of cocaine and over 10 kilograms of heroin. For approximately seven years prior to his current assignment, from the fall of 1992 to the winter of 1999, Trooper Cepero was assigned to the Criminal Division of the Massachusetts Attorney General's Office with his primary duties being the investigation of narcotics organizations throughout the Commonwealth of Massachusetts. Most

5

of those investigations involved undercover operations as well as physical and electronic

surveillance. During his assignment to the Attorney General's Office, Trooper Cepero was

involved in hundreds of undercover narcotics investigations involving the distribution of

cocaine, crack cocaine, heroin, marijuana, and designer drugs. Trooper Cepero also worked

with the U.S. Customs Service in the investigation of several domestic and international money

laundering operations active in Massachusetts and other New England states, which resulted in

the seizure of hundreds of thousands of dollars. From the fall of 1987 to the winter of 1992,

Trooper Cepero was assigned to the Massachusetts State Police Detective Unit and later the

DEA Narcotics Task Force at Logan International Airport as a federal Task Force Agent.

During this period, Trooper Cepero's primary duties were the identification and interdiction of

drug couriers as well as assisting other narcotics units in undercover operations. In the field of

narcotics interdiction, he has been involved in numerous investigations and arrests that have

resulted in the seizure of large quantities of drugs, ranging from 100 pounds of marijuana, to

16 kilograms of cocaine and kilogram-quantities of heroin. From the summer of 1984 to the

winter of 1987, Trooper Cepero was assigned to the Suffolk County Narcotics Task Force.

During this period, he was involved in hundreds of narcotics investigations within Suffolk

County, which includes the cities of Boston, Winthrop, Everett, Chelsea and Revere. These

investigations involved undercover purchases of marijuana, cocaine, heroin and other

controlled substances. Those purchases ranged from one gram of cocaine to as much as 20

kilograms (44 pounds) of cocaine, and from a single bag of heroin to over 200 grams of

heroin. Throughout his career, Trooper Cepero has participated in debriefings of dozens of

defendants, informants, and witnesses who had personal knowledge regarding major narcotics

6

trafficking organizations, and have participated in all aspects of drug investigations including conducting surveillance, acting as an undercover officer, executing searches pursuant to court ordered search warrants, and executing arrests. He also have participated in joint investigations with the Federal Bureau of Investigation ("FBI"), DEA and the U.S. Customs Service involving interstate and international narcotics traffickers. These investigations included undercover operations as well as electronic surveillance. Trooper Cepero has received extensive, specialized training in the field of narcotics identification and investigation. This training has included instruction at the Massachusetts State Police academy in the identification of controlled substances and participation in a two-week advanced school in the field of narcotics identification and investigations presented by the Drug Enforcement Administration. He has also attended several seminars throughout my career dealing with the field of narcotics. This included a 3-day DEA Commercial Transportation Interdiction school, dealing with the methods used for smuggling narcotics through airports, train stations and other commercial ports of entry. Trooper Cepero has been qualified as an expert in narcotics-related matters in stated and federal courts.

Lieutenant Hanson's 's qualifications to testify are as follows:

Lt. Hanson is presently the evening shift commander for Trooper C. He has been employed as a Task Force Agent of the United States Drug Enforcement Administration ("DEA") from 1999 through 2005. He has been employed as a Trooper with the Massachusetts State Police since December 1985. From 1989 through 1999, Lt. Hanson was assigned to the State Police Narcotics Detectives Unit of the CPAC Division assigned to the Suffolk County District Attorney's Office. During his employment with the State Police and

7

DEA, he has participated in numerous investigations relating to the distribution of controlled

substances, including heroin, cocaine and other substances in violation of the federal and state

anti-drug laws, including Title 21, United States Code, Sections 841(a)(1) and 846, and M.GL.

c. 94C. Lt. Hanson has made over 500 narcotics- related arrests in his career. He has also

participated in hundreds of undercover purchases of controlled substances, including heroin

and cocaine, during his police career. He has been the affiant on numerous affidavits in

support of search and arrest warrants for narcotics-related offenses and other applications. Lt.

Hanson has received training in the field of narcotics enforcement and investigations in the

State Police Academy and from the DEA. He also has a Bachelor of Arts degree and a

Master's degree in criminal justice. From his experience and training, he is familiar with the

habits, methods, routines, practices and procedures commonly employed by persons engaged

in the trafficking of illegal drugs. Lt. Hanson has had extensive experience in the investigation

of drug traffickers, including the debriefing of numerous defendants, informants, and witnesses

who had personal knowledge about drug trafficking activities and the operation of drug

trafficking organizations. He has participated in almost all aspects of drug trafficking

investigations, including but not limited to conducting surveillance, acting in undercover

capacities, using confidential informants, and conducting court-authorized wire and electronic

surveillance. Through his training, education and experience, Lt. Hanson has become familiar

with the manner in which illegal narcotics are transported, stored, and distributed, and with the

methods of payment for such drugs. He is also familiar with the manner in which drug

traffickers use vehicles, common carriers, mail and private delivery services, and a variety of

other means to transport and distribute drugs and the proceeds of drug trafficking. Lt. Hanson

8

is further familiar with the manner in which drug traffickers use telephones, coded telephone conversations, pagers, coded pager messages, and other means to facilitate their illegal activities. Lt. Hanson has been qualified as an expert the field of narcotics related investigations in Massachusetts Superior Courts.

TFA Marcos Chavez's qualifications are as follows:

TFA Chavez is presently attending the Academy for the U.S. Postal Inspectors Service. Prior to attending the academy, Chavez was a Lowell PD Officer for nine years, the last five with the DEA Task Force (August 2001-July2006). He has participated in numerous undercover buys of controlled substances; has made numerous narcotics-related arrests; participated in the execution of search warrants in connection with narcotics laws violations; and has worked with confidential informants in narcotics investigations. TFA Chavez has attended trainings in narcotics investigations and enforcement, including the 21 week Police Academy (1997) in Lowell, MA; DEA training in Quantico, VA, for Complex and Conspiracy Investigations; and Narcotics in the US Postal Service at Potomac, MD. He has received a Masters in Criminal Justice from UMASS Lowell (2000), and a BA in Psychology, minor in History, from UMASS Lowell (1992). Through his training, education and experience, TFA Chavez has become familiar with the manner in which illegal narcotics are transported, stored, and distributed, and with the methods of payment for such drugs; the manner in which drug traffickers use vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute drugs and the proceeds of drug trafficking; the manner in which drug traffickers use telephones, coded telephone conversations, pagers, coded pager messages, and other means to facilitate their illegal activities.

9

### 4. Jennifer Chu, Forensic Chemist, DEA

#### C. Summary of Anticipated Testimony

If the parties are unable to arrive at stipulations regarding drug analyses, Ms. Chu will testify consistent with her reports which have been provided to the defendant as part of automatic discovery. The government has also enclosed a copy of all documentation generated by Chemist Chu during her testing procedures in this case. Ms. Chu will testify to the general manner and method of testing the drugs seized or acquired in connection with these cases. She weighed the packages which the defendants allegedly possessed and determined that the net weight of the packages (without the packaging), as reflected on the drug certificates. Ms. Chu did this by first weighing each full package. She then removed the drugs and weighed the empty packages. She would then subtract the weight of the empty package from the weight of the full package to arrive at a net weight. In addition, Ms. Chu will testify that she performed a preliminary color screening test on each of the samples (reflected in the enclosed materials) as well as micro-crystal screening tests on each of the samples. The results of those tests indicated that the substance appeared to contain heroin. Ms. Chu generated drug certificates indicating that the substances were heroin as well as relevant gross/net weights. Due to a lab policy change, the more recent set of exhibits (Exhibit 12 and on) were further subjected to confirmatory screening tests (FTIR-ATR or GC/MSD) to determine the presence of controlled substances. These tests were on each of the units before Ms. Chu combined them to conduct further analysis. Exhibits 16 and 17, which contain marijuana , and Exhibit 18, which contains inositol, were not "screened."

#### D. Qualifications and Bases for Opinions

10

Ms. Chu is currently a Forensic Drug Chemist for the DEA in New York, NY, where she routinely weighs and analyzes suspected narcotics for criminal cases. She has been employed as a chemist with this laboratory since 2002, and has performed screening analyses and mass spectrometer analyses on hundreds of suspected narcotic samples. Ms. Chu received her bachelors of science in chemistry from State University of New York in Binghamton in 1999.

Ms. Chu has specialized training in performing chemical analyses on narcotics from the Drug Enforcement Administration, and has received training in various analytical techniques including the screening analyses she performed in this case, and in the operation of the mass spectrometer. She has testified as an expert in federal courts. A copy of her CV is attached.

5. Detective Lieutenant Brian M. O'Hara

A. Summary of Anticipated Testimony

Detective Lieutenant O'Hara will testify in accordance with his report provided to you during the course of discovery. D Lt O'Hara will testify that he fumed, dye-stained and examined the 9 mm caliber AA Arms, model AP-9, serial # 033232, that Santiago is charged with unlawfully possessing in an attempt to lift latent fingerprints from the weapon. However, he was unable to obtain any latent prints (he did get friction ridge detail, but it was of insufficient detail for comparison). He will also testify that he fumed, and examined the magazine and bullets seized from Santiago's residence, but was unable to lift any latent fingerprints from these items. Lt. O'Hara is expected to testify that it is rare to successfully lift a utilizable fingerprint from a firearm. He will opine that there are a number of factors that account for the inability to recover fingerprints from handguns and magazines seized, including the following: (1) fingerprints are made up of more than 95 per cent water and are therefore a

11

very fragile form of evidence; for example, the action of placing a handgun into or removing it from a pocket can wipe off any fingerprints on it, as can the act of rendering the handgun safe after it is recovered by working the slide; (2) when a person handles a handgun his palm and fingertips typically touch the grip and his first finger touches the trigger guard or trigger; handgun grips may be dappled or ridged, and therefore do not take fingerprints or palm prints well; (3) the way in which an individual handles a magazine can cause fingerprints on the magazine to smear; (4) many firearms are coated with an oily surface to prevent the firearm from rusting; and (5) the size and shape of a firearm may decrease the chances of a fingerprint being left.

Lt. O'Hara is expected to testify that individuals may touch items and not leave detectable latent fingerprints or palm prints behind. Lt. O'Hara will testify generally that a number of factors may affect whether a detectable latent fingerprint is left behind on a surface, including the surface itself (porous or non-porous / smooth or irregular), the person touching the surface (whether they perspire from their hands or fingertips, whether they secrete amino or fatty acids from the hands or fingertips, whether they are barehanded or wearing gloves); and the environment (temperature and humidity, and how substances in the environment, such as heroin, may impede the placement of latent fingerprints on surfaces).

B.  Qualifications and Bases of Opinions

Detective Lt. O'Hara has retired from the state police. Prior to retirement, he served in the Massachusetts State Police for over 26 years. From 1996 through 2002, Lt. O'Hara was the Supervisor of the State Police Crime Scene Services Section. He has processed hundreds of crime scenes and analyzed thousands of pieces of evidence throughout his career. He has

12

testified as an expert in state superior and district courts as well as the federal court. A copy of D Lt O'Hara's résumé is attached.

6. State Police Trooper Stephen J. Walsh

A. Summary of Anticipated Testimony

Trooper Walsh will testify consistent with the material contained in his report which was provided as part of automatic discovery. In addition, he will testify that the 9 mm caliber AA Arms, model AP-9, serial # 033232, seized from Santiago's residence, is manufactured by AA Arms, Inc., Mint Hill, North Carolina; that it is designed to discharge a projectile through the action of an explosive; that he examined and test-fired the weapon and ammunition seized from Santiago's residence; that it is an operable firearm; and that the ammunition that were seized with it are live ammunition capable of being discharged by said handgun.

B. Qualifications and bases of Opinions

Stephen J. Walsh is a Trooper with Massachusetts State Police. He has been a trooper since 1993 and has been assigned to the firearms identification unit since January 1999, which included a two-year apprentice program. In addition to his extensive on-the-job training, he has attended various armor courses taught by various gun and ammunition manufacturers dealing with the manufacture, assemble and repair of firearms. As part of his current responsibilities, he responds to crime scenes to preserve and collect firearm evidence, attends autopsies to review and retrieve firearm evidence, and test-fires firearms to determine weapons capabilities. He has been qualified as an expert in firearms related matters in state and federal trial courts. A copy of his résumé is attached hereto.

7. Michael L. Frayne

13

A. Summary of Anticipated Testimony

Senior Fingerprint Analyst Frayne will testify in accordance with his reports, dated November 17 and November 22, 2004. Mr. Frayne will testify that he fumed, dye-stained and examined the coffee cup recovered after a police stop of Jose Torrado on August 26, 2004. A positive identification of an inked print belonging to Torrado and a latent print lifted from the coffee cup lid was made.  Mr. Frayne will testify that he fumed, dye-stained and examined Exhibit 12, a black plastic bag and 5 plastic sandwich-type bags recovered from 264 Mechanic Street, Leominster, on or about October 15, 2004. No latent prints were detected on those items. Mr. Frayne is expected to testify that individuals may touch surfaces of items and not leave detectable latent fingerprints or palm prints behind.

B. Qualifications and bases of Opinions

Mr. Frayne serves as a Senior Fingerprint Specialist in the DEA Field Laboratory in New York. Mr. Frayne has testified as an expert fingerprint examiner in federal, state, local and military courts. A copy of his CV is attached along with a copy of Torrado's inked fingerprint cards and an image of the fingerprint detected on the coffee cup lid.

8-11.    Department of Public Health Assistant Analysts

Della Saunders or Michael Lawler and Xiu Ying Gao or Mai Ngoc Tran. If the parties are unable to arrive at stipulations regarding drug analyses, Della Saunders or Michael Lawler will testify to the results of their examination of substances seized from Enrique Agosto on May 5, 2004. A copy of the Certificates of Analyses is included herein (Lab No. 738375 and 738376), which certifies that the substances were 12.67 grams and 10.14 grams of heroin respectively. Similarly, if the parties are unable to arrive at stipulations regarding drug

14

analyses, Xiu Ying Gao or Mai Ngoc Tran will testify to the results of their examination of

substances seized from Jose Rodriguez on or about April 18, 2003, at 261 Aiken Avenue in

Lowell. A copy of the Certificates of Analyses is included herein (Lab No. 650951 and

650952), which certifies that the substances were .53 grams and 1.90 grams of heroin

respectively. I will forward the underlying reports pertaining to these analyses, as well as

qualifications of the chemists, if necessary, as soon as I receive them.

```
                          Respectfully submitted,
                          MICHAEL J. SULLIVAN
                          United States Attorney


                   By:   /s/William F. Bloomer
                         WILLIAM F. BLOOMER
                         Assistant U.S. Attorney
                         BBO#553104
                         william.bloomer@usdoj.gov
                         (617) 748-3644
```

## CERTIFICATE OF SERVICE

    I, William F. Bloomer, hereby certify that I have this day
served upon the defendants in the above-captioned matter a copy
of the foregoing document and its attachments by causing it to be
delivered by FedEx, postage prepaid, to counsel of record in the
above-captioned matter.

```
                         /s/William F. Bloomer
                         WILLIAM F. BLOOMER
```

Date: 31 August 2006